791 So.2d 126 (2001)
Douglas A. ABADIE, et al.
v.
METROPOLITAN LIFE INSURANCE COMPANY, et al.
Addressing Individual Appeals: Earlven Gauthe.
Nos. 00-CA-344, 00-CA-345, 00-CA-346, 00-CA-347, 00-CA-348, 00-CA-349, 00-CA-350, 00-CA-351, 00-CA-352, 00-CA-353 through 00-CA-856, 00-CA-394, 00-CA-489 and 00-CA-625.
Court of Appeal of Louisiana, Fifth Circuit.
May 8, 2001.
Opinion Granting Rehearing in Part May 31, 2001.
*127 Robert E. Caraway, III, Plauché, Maselli, Landry & Parkerson, New Orleans, LA, Attorney for Defendants/Appellants, Steven Kennedy, Peter Territo, and American Motorists Insurance Company.
Mary L. Dumestre, Marjorie M. Campbell, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, Attorneys for Defendants/Appellants, Avondale Executive Officers.
Samuel M. Rosamond, Fleming & Rosamond, Metairie, LA, Attorney for Defendant/Appellant, Commercial Union Insurance Company.
Thomas G. Milazzo, James L. Fletcher, Jr., Pamela B. Gautier, LeBlanc, Miranda, Warwick & Milazzo, Metairie, LA, Attorneys for Defendants/Appellants, Asbestos Corporation Limited.
Leon Gary, Jr., William L. Schuette, Jr., Antonio D. Robinson, Avery Lea Griffin, Jones, Walker, Waechter, Poitevent, Carerre & Denegre L.L.P., Baton Rouge, LA, and Madeleine Fisher, New Orleans, LA, Jones, Walker, Waechter, Poitevent, Carerre & Denegre L.L.P., Attorneys for Defendant/Appellant, CBS Corporation.
Frank J. Swarr, Mickey P. Landry, Landry & Swarr, L.L.C., New Orleans, LA, Attorneys for Plaintiffs/Appellees.
Panel composed of Judges DALEY, EDWARDS, and ROBERT L. LOBRANO, Pro Tem.
ROBERT L. LOBRANO, Pro Tem.
We rendered our initial opinion in these consolidated asbestos appeals on March 28, 2001. Abadie v. Met. Life Ins. Co., 00-344 (La.App. 5 Cir. 3/28/01), 784 So.2d 46. We decided the issues identified by the parties as common to all of the appeals and disposed of the issues specific to the seven Group 1 plaintiffs. We rendered judgments in each of their cases. Earlven Gauthe was originally part of the Group 1 plaintiffs, but prior to oral arguments for that group, this Court received notice from the U.S. Bankruptcy Court that Owens Corning, one of the defendants cast in judgment with whom Mr. Gauthe had not settled, had sought relief in that court. The Stay order issued by the bankruptcy court required that this Court stay all appeals pertaining to Mr. Gauthe relative to all defendants and all issues therein. *128 Subsequent to the stay order being issued, plaintiff filed a Motion to Sever all claims against Owens Corning and requested this Court to hear and decide the appeals of the remaining defendants. Relying on the procedural mechanisms utilized by the Louisiana Supreme Court in Bourgeois v. A.P. Green Industries, Inc., 00-CA-1528 (La.4/3/01), 783 So.2d 1251, we granted plaintiff's Motion to Sever but stayed the effect of our opinion as to Owens Corning.[1] Accordingly, this opinion and decree has no effect on the rights and/or liability of Owens Corning.
The 19 issues identified by all parties as being common to all of these consolidated appeals were disposed of in our March 28, 2001 opinion. In that per curiam opinion, we determined that the finding of liability by the jury on the part of executive officers George Kelmell and J.D. Roberts was clearly wrong and reversed that finding as to all of the plaintiffs. And, of the nine settling defendants whose fault (for virile share purposes) was reversed on JNOV by the trial judge, we held that the trial judge was correct as to five (Anchor Packing, Armstrong World Industries, Flexitallic, Garlock, and Uniroyal), and we removed them from the virile share calculations as to all plaintiffs in these consolidated cases. As to the fault of the other four executive officers, and the remaining four settling defendants (Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool Manufacturing), we held that a plaintiff specific analysis was necessary. Finally, we upheld the sanctions imposed on Asbestos Corporation Limited (ACL), which provided that if plaintiffs proved they were exposed to asbestos products at Avondale, they were entitled to a presumption that each had been exposed to asbestos mined, sold, or supplied by ACL. Therefore, for the reasons assigned in our opinion of March 28, 2001, and the following additional reasons, we dispose of the above specific appeal concerning the claim of Earlven Gauthe.
The six month jury trial against the defendants resulted in a verdict in Mr. Gauthe's favor. The jury concluded that he had suffered an asbestos-related injury and awarded him $2,300,055.00. In addition, the jury determined the fault of various non-parties who had previously settled. Subsequent to trial and during this appeal, settlements were made with all defendants cast in judgment except for CBS Corporation, formerly known as Westinghouse Electric Corporation (hereinafter referred to as Westinghouse), ACL, the six Avondale executive officers (James O'Donnell, Steven Kennedy, John Chantrey, Peter Territo, George Kelmell, and J.D. Roberts), and of course Owens Corning, who is protected by the Federal Bankruptcy Laws. Therefore, at this juncture, there are eight viable remaining defendants.
Mr. Gauthe did not testify in person; however, his videotaped deposition was played for the jury. Mr. Gauthe testified that he started at Avondale as a carpenter helper, then became a tacker-welder, welder, shipfitter, and finally a leaderman shipfitter. He worked in the main yard from 1942 to 1970, then in the Westwego yard the last seven years of his employment, from 1970 to 1977. Mr. Gauthe testified that he did not think he was exposed to asbestos at the Westwego yard. Mr. Gauthe testified that he became disabled from arthritis in 1977.
Mr. Gauthe recalled some of the ships he worked on included the DE's, Lykes, Delta lines, Del Rio, and two others like it. He explained that when working at the *129 main yard, he worked in the same "holds" with the welders, fitters, and insulators. There were times when he had to remove covering (insulation) from pipes to repair them. Mr. Gauthe testified that sometimes during his lunch break he went under the platens and sat on sacks of asbestos covering. He explained that this was in the boiler area. He recalled seeing bags of Kaylo, Johns Manville products, and McCarthy gasket material. He could not recall the brands of any other type of pipe covering. Mr. Gauthe further testified that he did not use these materials as part of his job, but was exposed to these materials by working around others using these products. The dust from using these materials was blown around by the men using blowers. Some workers also swept the dust.
Mr. Gauthe also recalled working around Hopeman Brothers employees while they installed wallboards on the walls and ceilings of the ships. The evidence is undisputed that Hopeman Brothers employees installed asbestos-containing wallboards, called Fire Resistant Decorative Micarta, which were manufactured by Westinghouse. We explain, infra, the basis of Westinghouse's liability.
Mr. Gauthe testified that in the early 1950s he put a sidewalk in front of his home using asbestos scraps from the Johns Manville plant. He broke it up and hauled it away two years later.
Mrs. Gauthe testified that her husband worked at Avondale for 35 years, having started in 1945. He retired in 1977. She stated that when he came home from work, his clothes were white because they were so dusty.
Mrs. Gauthe testified that her husband had been ill since January 1995. He spent nine days in the hospital where tubes were inserted in his chest to drain fluid. He wanted to come to court to testify, but was unable to do so because of his difficulty breathing. She described her husband as a very active man, who walked five or six miles daily. He picked his grandchildren up from school and was active in helping others in his neighborhood. The sickness rendered him unable to do any of his previous activities. At the time of trial, he was unable to care for himself and needed assistance with all activities of daily living. He was constantly in pain and had difficulty breathing. As a result of his illness, Mr. Gauthe became depressed and sought psychiatric treatment. He was still under psychiatric treatment at the time of trial.
Mr. Gauthe was diagnosed with mesothelioma and died subsequent to trial.
Dr. Stephen Kraus, a radiation oncologist, testified as to his treatment of Mr. Gauthe. Dr. Kraus first met Mr. Gauthe in 1986, when he treated him for prostate cancer. As treatment for prostate cancer, Dr. Kraus administered radiation to Mr. Gauthe's pelvic region. During the course of hormone treatment for the prostate cancer, Mr. Gauthe developed enlarged breasts. In order to stop further development of breast tissue, Dr. Kraus administered radiation to the breast area. Dr. Kraus testified that the prostate cancer had not recurred.
Dr. Kraus learned during the course of this trial that Westinghouse claimed the radiation given to Mr. Gauthe for breast enlargement caused his lung cancer. Dr. Kraus testified that mesothelioma is seen more frequently in shipyard workers and asbestos plant workers because of their exposure to asbestos. He explained that he has never seen a case of mesothelioma caused by the administration of low dosages of radiation to the breast area.
Dr. Kraus testified that Mr. Gauthe had a chest x-ray in November 1994 which *130 showed a collection of fluid in the right lower lung along with pleural thickening. In January 1995, Mr. Gauthe complained of pain in his right chest. It was noted the fluid progressed. He underwent a thorascopy during which biopsies were taken. These biopsies were positive for mesothelioma.
Dr. Kraus explained that Mr. Gauthe would die from the mesothelioma which was caused by asbestos exposure. Dr. Kraus described Mr. Gauthe's pain as intractable, which means it never ends. He explained that the cause of death will be from fluid collection around his heart and lungs.
Portions of Mr. Gauthe's medical records and slides from his biopsy were examined by Dr. Samuel Hammar, an expert in the diagnosis of cancers caused by asbestos. A report by Dr. Hammar was admitted into evidence. Dr. Hammar agreed with the diagnosis of mesothelioma and stated this condition was caused by exposure to asbestos.
Dr. Dominic Gaziano, who was certified by the court as an expert in internal medicine, pulmonary medicine, critical care medicine, and as a B-reader, also examined portions of Mr. Gauthe's medical records. A report dated March 24, 1995 written by Dr. Gaziano was admitted into evidence. In this report, Dr. Gaziano agrees that Mr. Gauthe's cancer was caused by exposure to asbestos.
Dr. Philip Cagle, a defense expert in pulmonary lung pathology, also examined slides from Mr. Gauthe's biopsy, and agreed that Mr. Gauthe had mesothelioma. Dr. Cagle testified that there were three possible causes of Mr. Gauthe's disease: radiation, residential exposure to asbestos from the nearby Johns Manville plant, and exposure to asbestos at the shipyard. Dr. Cagle acknowledged the risk of developing cancer from the radiation therapy was small, and agreed that the logical cause was exposure at the shipyard. A report by Dr. Cagle reflecting these views was admitted into evidence.
A report by Dr. Robert Jones, the defendants' expert who was accepted by the court as an expert in pulmonary medicine and the diagnosis and treatment of occupational lung diseases, including asbestosis, was admitted into evidence. Dr. Jones acknowledged that Mr. Gauthe lived near an asbestos plant, but opined that because there was a greater intensity of the occupational exposure, "the larger part of Mr. Gauthe's mesothelioma risk would have come from his shipyard work."

EXECUTIVE OFFICER LIABILITY
The jury found all six Avondale executive officers liable to Mr. Gauthe. As noted above, in our initial opinion, we reversed the liability findings on the part of George Kelmell and J.D. Roberts. Mr. Gauthe was employed during the entirety of Mr. O'Donnell's tenure at Avondale (1948 through December 13, 1971). Mr. Gauthe worked at the main yard at Avondale until 1970, which was during Mr. Territo's tenure. Mr. Gauthe testified that he was not exposed to asbestos after 1970, when he went to work at the Westwego yard. Therefore the jury's findings against Mr. Chantrey and Mr. Kennedy, who headed the safety department after that time, are reversed. For the reasons assigned in our initial opinion, we affirm the jury's finding of liability against O'Donnell and Territo.

WESTINGHOUSE'S LIABILITY
Westinghouse raises three errors with respect to the jury's finding of liability on its part. It first argues that its product, Fire Resistant Decorative Micarta (FRDM), is not unreasonably dangerous per se, while its second and third arguments raise the issue of causation.

*131 UNREASONABLY DANGEROUS PERSE
Westinghouse argues that because FRDM posed minimal risks in comparison to its social utility, the jury was clearly wrong in concluding that it was unreasonably dangerous per se. We disagree.
FRDM was a decorative plastic laminate, similar to Formica, which was installed in the living areas of ships to protect the crew and passengers from fires. The only difference between FRDM and other laminates was that asbestos paper was encapsulated within FRDM to give it the necessary flame resistance. Because the asbestos was in plastic resin, it did not have the potential to release asbestos fibers unless it was cut. FRDM was attached to a sheetrock type product to produce a wallboard that was first used at Avondale in 1965. It is undisputed that Hopeman Brothers was the only marine joiner contractor to use Westinghouse's product and that its use was limited to the ship's living quarters located on the superstructure.
Halphen[2] and its progeny provide that a product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs its utility. To determine whether a product is unreasonably dangerous per se, a risk/utility test must be applied. Simply, if a product's usefulness to society outweighs the risks associated with its normal use, then the product cannot be unreasonably dangerous. The manufacturer's knowledge, or lack thereof, does not enter the equation.
Westinghouse asserts that the utility of saving lives from shipboard fires cannot be disputed and cites the fire aboard the Sea Witch as an example. Charles Johnson, Hopeman Brothers' Vice President, described that fire and the fact that the FRDM panels preserved the integrity of every space they were designed to protect. Westinghouse compares that social utility with the fact (1) that very few people are exposed to asbestos fibers from FRDM because they are not released until cut; (2) that it was used by Hopeman Brothers, knowledgeable contractors, who were aware of the dangers associated with asbestos and developed vacuum-equipped saws and drills to reduce the dust; (3) that FRDM contained only chrysotile asbestos, which are long, curly and fragile fibers that are the least harmful of asbestos when inhaled. In sum, Westinghouse argues that those factors make any risk from the use of FRDM minimal.
Plaintiffs counter those arguments with the testimony of their expert, Dr. James Millette, who performed varying tests to demonstrate the quantities of dust produced by Hopeman's cutting operations. Dr. Millette testified that the cutting of these panels produced some of the highest dust concentrations he had seen. Dr. Millette concluded that the obvious dangers related to the release of asbestos fibers in the normal use of this product outweighed the benefits associated with FRDM.
Westinghouse criticized Dr. Millette's tests. It challenged their credibility and reliability because Dr. Millette did not have a written protocol, the tests bore little resemblance to the conditions under which FRDM was used, and the results were incompatible with other properly conducted tests. Westinghouse argues that Dr. Millette's most glaring omission was his failure to determine which equipment was actually used by Hopeman Brothers at *132 Avondale to cut the FRDM,[3] and that the cut edge he achieved was far more jagged and frayed. Westinghouse points to Dr. Millette's admission that the type of saw and blade used affects the amount of airborne fibers. Finally, Westinghouse points to Charles Johnson's testimony, which refers to the 1972 air sample taken by Max Richard, an industrial hygienist, while Hopeman Brothers cut bulkhead panels onboard a ship at Avondale. Johnson testified that hose samples showed airborne asbestos levels below OSHA's limit and all Threshold Limit Values.
The serious health risks associated with exposure to asbestos fibers are generally well recognized and accepted. They need no extensive elaboration. The real issue confronting the jury was whether FRDM's normal use (its installation on ships, which necessarily required cutting) released those fibers in such quantity as to outweigh the undisputed utility of making the decorative Micarta fire resistant.
We make the initial observation that that issue may be classified as a mixed question of law and fact, and thus we question the propriety of Dr. Millette invading the province of the jury by rendering an opinion on that issue. That question was for the jury to decide. Nonetheless, we are satisfied that if there was error, it was harmless and the jury finding that FRDM was unreasonably dangerous per se was not manifestly erroneous. Arguably, had a substance other than asbestos been involved, the jury may have accepted Westinghouse's position. However, based on the record evidence, we cannot say that the jury's decision is so egregious as to warrant reversal. They heard all of the evidence on both sides of the issue, and presumably considered each and every argument Westinghouse has presented to us. Obviously, they believed that the dust created by cutting FRDM was of such a quantity as to pose a serious risk. That is a reasonable conclusion. Despite the credible arguments to the contrary by Westinghouse, we simply cannot say the jury's determination is wrong. An appellate court does not weigh credibility, only sufficiency. Certainly there was sufficient evidence for the jury to find that FRDM was unreasonably dangerous per se.

CAUSATION
Westinghouse's other arguments are geared to causation. In particular, it argues that plaintiffs testimony was insufficient to establish causation. Westinghouse says that it is not sufficient for plaintiff to merely state that he worked around Hopeman Brothers. Westinghouse points to the 13 other panels that were used at Avondale, none of which contained asbestos, as well as the argument that Hopeman Brothers used most of those other panels. As a final causation argument, Westinghouse asserts that plaintiffs exposure to other asbestos containing products was the real culprit, and that the evidence shows that those products caused the injuries.
Plaintiff argues that the law imposes no specific level of exposure to warrant liability[4]. Indeed, says plaintiff, the current trend of the national jurisprudence is that a plaintiff need not prove that he or she was directly exposed to any particular amount of fibers emanating from a product, so long as the exposure is demonstrated to be more than a trivial or de minimus amount.
*133 Because we have already decided that the jury was not clearly wrong in finding FRDM to be unreasonably dangerous per se, it follows that the asbestos fibers created by cutting FRDM were a substantial contribution to the level of asbestos fibers in the immediate environment surrounding Hopeman Brothers activities. We must now determine if there was evidence from which the jury could decide whether Mr. Gauthe was exposed to the asbestos dust produced by the cutting of the FRDM.
Mr. Gauthe specifically testified that he worked in the vicinity of Hopeman Brothers employees who installed wallboards on the walls and ceilings of the ships. Mr. Gauthe testified that he worked on all of the Lykes vessels and the Delta Lines constructed at Avondale's main yard. Charles Johnson testified that Hopeman Brothers performed all the joiner work[5] on all of those vessels using FRDM. We find this is sufficient evidence to support the jury's conclusion that Westinghouse should share liability for Mr. Gauthe's injuries.

QUANTUM
The jury awarded Mr. Gauthe $2,300,055.00 in damages. The defendants argue this award is too high based on the fact that Mr. Gauthe was 74 years old at the time of trial and had only been sick for ten months. They also point out that Mr. Gauthe did not seek lost wages, and his medical expenses at the time of trial totaled $31,554.85. Plaintiff argues that the award reflects Mr. Gauthe's physical and emotional pain and suffering, loss of enjoyment of life, and loss of consortium.
The jury viewed the videotaped deposition of Mr. Gauthe taken in March of 1995. The transcript of the deposition indicates that the deposition had to be cut short due to Mr. Gauthe's physical distress. Mrs. Gauthe described her and her husband's life together, as well as his condition at the time of trial. All of the physicians testified that Mr. Gauthe's cancer was caused by exposure to asbestos. Dr. Kraus, plaintiff's treating physician, testified as to the painful nature of plaintiff's condition, and described the mechanism of Mr. Gauthe's eventual death. We find the jury's award was reasonable based on the evidence presented.

JNOV AS TO SETTLING PARTIES
Of the nine settling defendants granted JNOVs, the jury returned findings against all seven that were listed on the interrogatories pertaining to Mr. Gauthe: Anchor Packing Co., Babcock & Wilcox, Combustion Engineering, Garlock, Inc., Rapid American, Rock Wool Manufacturing Co., and Uniroyal. As previously noted, we affirmed the JNOV in favor of Anchor Packing, Garlock, and Uniroyal. After review of the evidence presented against the remaining four settling defendants, we are satisfied that the trial judge erred in granting JNOVs as to their liability. Mr. Gauthe's work history and the evidence show that the jury's conclusions were reasonable in finding Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool liable.
Mr. Gauthe testified that he sometimes worked at the boiler site. We are satisfied that this is sufficient evidence for the jury to conclude that the boiler manufacturers, Babcock & Wilcox and Combustion Engineering, should share responsibility. He testified that he worked *134 in close proximity to the insulators who used pipe covering. He described the dusty conditions onboard the ships. He recalled working around asbestos mud, which is another name for asbestos cement. Again, we are satisfied that this is sufficient evidence for the jury to conclude that Rapid American, the insulation manufacturer, and Rock Wool, the cement manufacturer, should share responsibility. Thus, the trial court's JNOV in favor of these four manufacturers is reversed, returning them to Mr. Gauthe's virile share calculation.

EXPLANATION OF VIRILE SHARE CALCULATION
The amount of the amended judgment set forth in our decree ($536,483.52) represents four virile shares[6] at $134,120.88 per share. This amount was determined by the following calculation. The jury found thirteen (13) defendants liable: A.P. Green Industries, Inc., Westinghouse, GAF Corp., National Gypsum Corp., Pittsburgh Corning, Owens Corning, ACL, and six executive officers. The jury also found eleven (11) settled manufacturers liable: Anchor Packing, Babcock & Wilcox, Combustion Engineering, Fibreboard Corp., Garlock, Inc., Johns Manville, Owens Illinois, Rapid American, Rock Wool Manufacturing, Uniroyal, and UNR (UNARCO). This results in a total of 24 virile shares. We subtract two shares for Kelmell and Roberts (Avondale Executive Officers whose liability was reversed by this court in our previous opinion), two shares for Kennedy and Chantrey (Avondale Executive Officers whose liability was reversed in this opinion), and subtract three shares for the JNOVs that we affirm in favor of Anchor Packing, Garlock, and Uniroyal for a total of 17 virile shares. Prior to these proceedings, Johns Manville[7] declared bankruptcy and a trust fund was established. Pursuant to the terms of the trust, Mr. Gauthe received $20,000.00 from the trust. Hence we reduce the jury's award by that amount in calculating the judgment. The jury's damage award of $2,300,055.00 less $20,000.00 divided by 17 equals $134,120.88 per virile share.

DECREE
The trial court's judgment of December 9, 1996 is AFFIRMED IN PART AND REVERSED IN PART. We REVERSE the finding of liability of John Chantrey, Stephen Kennedy, George Kelmell, and J.D. Roberts; we REVERSE the JNOV removing Babcock & Wilcox, Combustion Engineering, Johns Manville, Garlock, Inc., and Uniroyal from the virile share calculations; in all other respects we AFFIRM the judgment of the trial court.
For the above and foregoing reasons (including those reasons of our original opinion referred to above), IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Earlven Gauthe and against CBS Corporation, formerly known as Westinghouse Electric Corporation, ACL, James O'Donnell, and Peter Territo in the amount of $536,483.52, plus legal interest from the date of judicial demand and all costs.
AFFIRMED IN PART; REVERSED IN PART.

ORDER
The appellee, Mr. Gauthe, and appellants, ACL and Westinghouse, have filed requests for rehearing regarding this *135 Court's opinion issued May 8, 2001. The requests filed by ACL and Westinghouse are denied and the request filed by plaintiff is granted in part.

REHEARING GRANTED IN PART:
Appellee filed a request for rehearing stating that this Court's May 8, 2001 opinion improperly computed his damage award. Specifically, appellee argues:
(1) This Court erred in reducing the damage award for the virile share of Owens Corning; and
(2) This court erred in reducing the jury award by both the amount received in settlement from the Johns-Manville Trust and by a full virile share.
The request for rehearing as to the first argument is denied. Appellee argues that in calculating the collectable judgment, we must include Owens Corning's virile share, since all defendants cast in judgment are solidary obligors and Owens Corning should be treated as an insolvent solidary co-obligor. In response, the appellants, Avondale Executive Officers, contend that they should not be called upon to satisfy Owens Corning's portion of the judgment; rather, the surety on Owens Corning's appeal bond should pay Owens Corning's share. It was appellee who urged this Court to severe Owens Corning from these proceedings and at this point we have no way of knowing whether Owens Corning is solvent or insolvent. We are prohibited from making any decision with regards to Owens Corning's ability to satisfy its portion of the judgment due to the stay order issued in connection with the bankruptcy proceedings. Our denial of appellee's request to include Owens Corning's virile share in our calculation of collectable judgment has no effect on appellee's right to collect from the other defendants if Owens Corning is found to be insolvent.
We find that appellee's requests that we amend the judgment to delete the reduction for the amount received from Johns-Manville has merit. Therefore, we amend our May 8, 2001 opinion as follows. The jury's total award of $2,300,055.00 divided by the total number of virile shares, 17, equals $135,297.35 per virile share.
IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Earlven Gauthe and against CBS Corporation, formerly known as Westinghouse Electric Corporation, ACL, James O'Donnell, and Peter Territo in the amount of $541,189.40, plus legal interest from the date of judicial demand and all costs.
/s/ Robert L. Lobrano
 JUDGE ROBERT L. LOBRANO
/s/ Thomas Daley
 JUDGE THOMAS DALEY
/s/ Marion F. Edwards
 JUDGE MARION F. EDWARDS
NOTES
[1] In our order granting the severance, we also noted that the issues raised by Owens Corning are identical to those raised by the other defendants.
[2] Halphen v. Johns-Manville Sales Corporation, 484 So.2d 110 (La.1986)
[3] Dr. Millette used the same saw used by Hopeman at other shipyards when performing his tests.
[4] This argument was asserted in the common issue brief filed by all plaintiffs. However, the Gauthe specific brief did not mention this argument.
[5] The testimony established that joiner work consists of finishing carpentry on a ship, including the installation of wallboards, which required, in many instances, cutting pieces to fit.
[6] The four shares are for the remaining defendants, ACL, Westinghouse, and two Avondale Executive Officers.
[7] See our initial opinion, Abadie v. Metropolitain Life Ins. Co., supra, for an explanation of why we include Johns Manville in the virile share calculation.